Ms. Hagan, you have reserved 2 minutes for rebuttal, so that gives you 8 minutes to start. I might want to reallocate that depending on how this goes. Well, I think you make your call now, so do you want to go with 2 or something different? Let's go for 7 and 3. 7 and 3? I'm sorry. All right, so we'll give you 3 minutes for rebuttal. My apologies. That's all right. May it please the Court, my name is Special Hagan, and I stand before this esteemed tribunal on behalf of my client, Robin Collymore. It's apropos that we appear here today before you the day after Dr. King's birthday. It's been 9 years. We commenced this action on October 23, 2016, and we're here in front of this esteemed tribunal for a second time. I'd like to focus on, I guess, a number of things, but perhaps the first would be the retaliation claims. It should be noted that the appellate court did not limit the facts upon which the parties could proceed but the claims. Therefore, the approach taken by the district court in its analysis of the record we find to be problematic. As the esteemed tribunal is aware, we appealed the district court's dismissal of Ms. Collymore's claim on a motion to dismiss initially. And this court reversed in part and vacated in part that initial dismissal, preserving Ms. Collymore's retaliation claims under Title VII, 1983, the New York State and New York City human rights laws. And what the court did focus on were the migraines and the lunch, the scheduling of the lunch. But at that time, discovery hadn't taken place. There was a limitation in the claims but not the facts to be actually analyzed in terms of assessing whether or not Ms. Collymore experienced a hostile work environment. And drawing the court's attention to the analysis in the memorandum in order as it was rendered, which would be the special appendix 81 through 86. What is the adverse action that Ms. Collymore is complaining of in terms of her retaliation claim? Well, there were one of the things that we're asserting is that the district court ignored a number of adverse actions that came out during the pretrial process. I'm asking you to tell us now what those adverse actions were. Sure. The removal of the subject matter expert, Ivan Goldberg. Her removal from the BPR FDCAD program, which was her training. She administered training. That was her job. She was project manager for training. She also experienced, so there was a diminution of her responsibilities. There was also the scheduling meetings. There was also the performance rating, the marginal performance rating of 2. That was ignored by the court. And then also the termination letter, the January 13, January termination letter, which is volume 6, joint appendix 2048. But these things that you just listed are not in the complaint, right? Well, the January 13, 2016 termination letter was something that Ms. Collymore wasn't actually privy to. It was an exchange. Just my question is that this is not in the complaint. The complaint is really about the migraines and it's about the union lunch, right? There was more to it than that. She was denied overtime. She was denied compensatory time. Doesn't the record indicate that she received more overtime than anyone, twice as much as the second highest person? There was no admissible evidence to that effect. There was conflicting testimony. There was Ms. Collymore's account that she was denied, and then there were defendants' accounts that she was. And what they did was they generated an Excel spreadsheet that basically said that she may have accrued more overtime and compensatory time. But it wasn't necessarily – I guess you can't necessarily authenticate whether or not that came from their city timekeeping system or was it something that they actually generated on their own. Again, this is a disputed issue of fact. There was no admissible evidence to the effect that she actually received more overtime than anyone else. But if the supervisor testified that she received the most overtime of anyone, why isn't that admissible? Well, I guess you would have a disputed issue of fact because she's countering that she didn't. And then you also have – Did she say she did not receive more overtime than anyone else? Yes. Yes, and she testified to that effect. And she testified to an environment or a climate where there was a gentleman's agreement amongst the white male employees that they could come and go as they pleased and that they actually received and did get the overtime and compensatory time that they did request. There were – the district court also ignored the removal of her training, her job function. She didn't address that as well. But I think that what's a key note here, and that's the court's omission of the January 13, 2016, request for employee termination. We feel that the court's refusal to address this particular letter and the e-mails and the discussions about her termination about a week after one of her complaints, January 6th – between January 6th and January 7th, when Ms. Collingmore complained that she had been experiencing a hostile work environment. And within a week, Mr. Austin and Ms. Maloof circulated this e-mail basically contemplating and planning her termination. And the district court ignored that record evidence. And it's our position that the district court basically took away Ms. Collingmore's rights to basically establish intent. I would like to draw the court's attention to some of the cases that probably would more align to this type of analysis. First, in 1998, the court decided Gallagher versus Delaney. And there's a whole discussion of dignity in the workplace and engaging in a context-specific analysis of the workplace. And it's our position that this did not take place in this particular instance. And I guess this is a – and it's a sexual harassment and retaliation case decided by this court. And then I guess we could fast-forward to 2019 with Davis-Garrett versus Urban Outfitters. And the court took a similar approach, but in that instance, you were dealing with age discrimination and retaliation. But it was still the context-specific mosaic of the workplace looking at the adverse employment actions as an aggregate. And it's our position that, again, the court did not engage in that type of analysis. There was a conflation of the but-for analysis and the – and it was a conflation of the but-for analysis and other – I guess an itemized, an isolated perspective of the workplace. All right. Well, you reserved three minutes for rebuttal, so we'll hear now from Ms. Sadria. Am I pronouncing that right? Sadria. Sadria. Sadria. Say it again into the mic so we can make sure we get it right. Good morning, Your Honors. Taha Sadria appearing on behalf of the City of New York. Just to go back to the retaliation claim that my colleague was just speaking of, as Your Honor noted, Matthew Austin testified that Plaintiff received more overtime than anyone else in the group. And his – and the contemporary – contemporaneous records also reflect that she received more overtime than others. And she has not – Plaintiff has never identified more than one specific instance of Austin being – denying her overtime. And she has never identified any basis for asserting that others received more overtime or more compensatory time or had fewer issues in obtaining such overtime or compensatory time. With respect to the termination letter, the termination letter itself is not an adverse action. Since Plaintiff never knew that it existed, it could not possibly have dissuaded a reasonable employee from making a complaint. That was January of 2016? That was – the termination letter was January – middle of January, January 13th or January 16th of 2016, yes. And the employment ended – when was it, in June? June, yes. But the employment did not end as a result of this retaliation letter. I mean – I apologize – this termination letter. The termination letter basically requested termination or recommended termination, and it did not happen at that time, right? Exactly. Right. It did not happen, yes. And I think I – it's important to outline the sequence of events here, because Austin wrote up Plaintiff for various complaints that he had about her performance on January 6th of 2016. The very next day is when she – is when Plaintiff filed a complaint with the internal EEO office about Austin's – what she termed belligerently or aggressive behavior earlier in time. And so it couldn't – so that action happened before any complaint that she made. The EEOC complaint that she made against Austin happened at the very end of January. And so if one is looking at timing, there is nothing to suggest that this was – that Austin's dissatisfaction with her performance was in retaliation for complaints that she had made. And it's similar with Malouf, in that she – Malouf had an extended discussion via e-mail with Plaintiff regarding her decision to decline various meetings with the program director and, you know, stating that she felt that this was poor judgment, poor exercise of judgment. And it was after that exchange, shortly after that exchange, that she then filed an EEOC complaint. Well, can I – I mean, Judge Chin had asked Ms. Hagan to identify what are the adverse actions that form this retaliation claim.  And, I mean, I'm having trouble understanding that, too. So as far as you're concerned, what are the adverse actions that are being asserted that were properly before the district court? That were properly before the district court, there was the issue that Plaintiff asserted that she was – that the defendants were scheduling lunchtime meetings in retaliation in order to target her health. Do I get that one? Anything else? What else? I mean, the other things in terms of the – in terms of the state and local retaliation claims, she had asserted that she was experiencing a hostile work environment because Austin was – and Maloof were yelling at her or talking over her. But that's an environmental – that's a – I'm asking just for the retaliation. You're saying that the hostile work environment was part of her retaliation claim? She is asserting that that was part of her retaliation claim. That was my understanding. She has asserted in – on summary judgment, a number of issues as identified here that were not part of her complaint regarding the removal of Ivan Goldberg and her removal from the specific aspect of the training program for the fire department. Right. So you're saying those are off the table or those are things that – The city's position is that those should be off the table because they were not in her complaint. And overtime is part of the retaliation or not part of the retaliation as far as you're concerned? I have to say it becomes confusing for me, like, which claims are supposed to be part of retaliation claim versus which claims are supposed to be part of discrimination claim. But she certainly does – has alleged that she was denied overtime and compensatory time and that it became worse. And so – but she hasn't identified a connection between taking a particular protected action and then a change in the amount of overtime or compensatory time that she received. So I don't believe that – I believe that the primary retaliate – And with respect to the lunchtime meetings, there is no showing that this either truly was an adverse action in any kind of a meaningful way or that it was – because these were not targeted meetings. They were – it was a minimal infringement on the lunchtime she was able to eat during those meetings. And she has never testified that she was not entitled to eat during those meetings. And if they were – I mean, they were designed for a large number of people in connection with program needs. Similarly, she has alleged sexual harassment, but as this court found in connection with the dismissal – the appeal from the dismissal of the complaint, she has not shown that this – the alleged touching was in any way sex discrimination since the – Lisa Maloof allegedly touched everybody, including the program director, in the same way. And similarly, she has not demonstrated any basis for finding that anything – any of the actions that she is alleging were adverse were motivated by race. If the Court has no further questions, I will rest on my brief. All right. Thank you very much. Ms. Hagan, you have three minutes for rebuttal. I'd like to point – in terms of the adverse employment actions Ms. Collymore alleges that she experienced, I'd like to draw the Court's attention to page 14 of Appellant's reply brief. I did mention most of these. I'd like to add the 8 a.m. – the change of Ms. Collymore's work schedule from 8 a.m. to 4 – 8 a.m. to 4 p.m. to 9 a.m. to 5 p.m. Then, of course, I had mentioned the removal of one of her primary job functions. I mean, is there any suggestion that that change in time was directed at her or had anything to do with her race? Ms. Collymore alleges that the shift change took place – that there was disparate treatment that took place. One, that it was based on retaliation for her complaints. And then, two, that she was treated – Well, on paper it did. But Ms. Collymore alleges that there was a gentleman agreement that Ivan Goldberg, Jean Uriman, white men were allowed to continue and that they had actually told her that. And there was no admissible evidence that actually this took place. I wanted to make sure that the Court was clear that Ms. Collymore also had a retaliatory hostile work environment claim. So that's why there is a conflation of the two. In terms of the union lunch, it's Ms. Collymore's position that the Court basically took the defendant's explanation as true. When it should not have, there was no admissible evidence to the effect that there was a collective bargaining – the collective bargaining agreement stated that she had to take the lunch between 12 and 2 or that they allowed people to eat lunch. There was no evidence in either direction, right? Well, actually, no. There was – you know, Mr. Austin actually testified that he had never seen anyone eating lunch during the meetings that were scheduled during that time. So – The collective bargaining agreement. It wasn't introduced, was it? No one introduced the collective bargaining agreement. What you had was Ms. Collymore's belief that she had to take lunch between 12 and 2. And you also had the Director of Labor Relations and another person, Miles Driscoll and Alice Perkis, exchanging an email debating whether or not there was a union lunch. And they ultimately agreed that there was an agency practice that they took lunch between 12 and 2. And then Austin testified, as I said before, that he had never seen anyone eating lunch during that time. So there's a question as to whether or not that was actually practiced. Ms. Collymore asserts that she was not allowed to eat lunch between 12 and 2. And as a result, that's why she developed these migraines and worked through – and basically saw that it was retaliatory. We also see that the district court ignored the record of evidence in terms of the sexual harassment claim. I'd like to draw the court's attention to a recent decision in Reed versus the City of New York, which was decided on December 27, 2024, this year. Now, granted, they found in favor of the city, but it was because it was only the federal claims. In that instance, it involved an undercover, I guess, informant who had made allegations of sexual harassment and unsexual touching against, I guess, her colleagues. And the citation would be 20CV3976, EDNY, December 27, 2024. And the language I'd like to draw to the court's attention is that the right to bodily integrity is clearly established – it's a clearly established right protected by the Due Process Clause. And I guess the last thing that I wanted to talk about was the EEPC audit, that the court basically ignored the statistical data as it pertained to the underrepresentation of women and black – black women and blacks and women in plaintiff's job group and the irregularities in the hiring process. In terms of Ms. Collymore's disparate treatment claims, her gender and race disparate treatment claims, the district court ignored this altogether and in Walsh, this court found that such evidence could be indicative or reflective of a disparate treatment claim. All right. Well, we will reserve decision. Thank you both. Thank you.